**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANNE MAUSEHUND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 05 C 1893** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before this Court on Plaintiff's motion for summary judgment and the Defendant's motion for summary judgment. Plaintiff, Dianne Mausehund, ("Plaintiff or "Claimant"), challenges the decision of Defendant Jo Anne Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), claiming that her denial of Plaintiff's request for Social Security Disability Insurance Benefits ("DIB") should be reversed or remanded because the Administrative Law Judge ("ALJ"): (1) erroneously failed to properly explain why he gave reduced weight to the treating physician's opinion, (2) erred by failing to meet the legal requirements in finding the Claimant not credible, and (3) erred by posing an incomplete question to the vocational expert. For the reasons stated below, this Court denies Claimant's motion for summary judgment and grants the Commissioner's motion for summary judgment.

# I. BACKGROUND FACTS

## A.  PROCEDURAL HISTORY

Claimant filed an application for DIB on November 6, 2000, alleging a disability since March 29, 2000, due to depression, stroke / cerebro vascular accident, severe back pain, and a herniated disc.  R. 55-8.  The application was denied initially, R. 21, and again upon reconsideration.  R. 22.  On August 29, 2002, Administrative Law Judge Dennis R. Greene ("ALJ") held a hearing on the question of disability.  R. 374-417.  Claimant, who was represented by counsel, testified at the hearing.  R. 380-99.  GleeAnn Kehr, a vocational expert, R. 394-97, 414-16, Dr. Ashok Jilhewar, a medical expert, R. 399-413, and Dr. Richard Zaloudek, a medical expert, R. 413, also testified.

On January 9, 2003, the ALJ issued his decision, and determined that Claimant was not disabled and was, therefore, not entitled to benefits.  R. 11-19.  On February 10, 2005, the Appeals Council denied Claimant's request for review.  R. 4-7.

Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1).  The Court conducted an oral argument on November 8, 2005.

## B.  HEARING TESTIMONY - AUGUST 29, 2002

### 1.  Claimant's Testimony

Claimant was 43 years old at the date of her hearing.  R. 380-81.  She is married and has no dependent children.  R. 380.  Her husband is the sole provider for their family.  R. 388.  She has a General Education Development (GED) degree.  R. 381.  Claimant has no

other education or training. R. 381-82. Her relevant past work experience includes employment as a packager, machine operator, and quality assurance clerk. R. 383-86, 396-97. Her last day of employment was March 29, 2000. R. 383.

At the hearing, Claimant testified she "wouldn't be able to tolerate working" due to back pain, a numb left arm, and pain in her right leg and hip that makes her lose her balance easily. R. 397-98. She cannot get up and clean her own home. R. 398. Towards the end of her employment Claimant performed her job sitting down and did not lift anything. R. 396-397. She is also depressed, but she stated that her depression is due to her physical impairments and she would not be depressed if she was healthy. R. 400, 411.

Claimant had back surgery and does not like taking pain medication out of fear of becoming addicted to the medication. R. 398. She was prescribed a cane after a 1996 surgery. R. 406-07. She testified that Dr. DePhillips wants to perform another surgery on her back and "put a plate there." R. 398-99. She further testified that "they want to do another surgery on the neck to remove the disc, put a spacer, put a plate in my neck, to help bring back the feeling in my left arm, and then do a surgery on my elbow to bring back the feeling in my ring finger and my pinkie." R. 399.

## 2. Dr. Ashok Jilhewar - Medical Expert ("ME")

Dr. Ashok Jilhewar, a gastroentrologist with 10% of his practice consisting of primary care in internal medicine, R. 51-4, testified as a medical expert at the hearing regarding Claimant's medical impairments and Claimant's pain allegations. R. 399-409. The ME is board certified in internal medicine. R. 51. Unfortunately, some of the ME's testimony is

inaudible.  Regarding the Claimant's pain symptoms, the ME said there are "[s]ome physical findings, but we have no documentation of the (INAUDIBLE) by the examiners or by the treating physician, so ... it is a question of [the ALJ] deciding how credible and good for the [C]laimant's (INAUDIBLE)."  R. 400.  He testified that the following procedures had been performed: an EMG, a scan of the neck and low back, a neurological consultation, and a neurosurgical consultation.  Therefore, he said that if he was "the (INAUDIBLE) physician, [he has] nothing else to offer such as a hypothetical (INAUDIBLE) except the symptom." R. 401.

The ME concluded that "[t]he objective findings are not there.  The EMG is normal . . . the shoulder x-ray is normal.  The doctor is writing in the chart that the symptoms, and she does not understand why, so the (INAUDIBLE) is no diagnosis."  R. 399.

He stated that the neurological examination shows no motor weakness and there were "two different doctors on neurological and neurosurgeon, but to [him] they don't explain the symptoms."  *Id.*  He said the problem with Claimant's symptoms are that "40% of the population has it, and 40% of the population has the pain."  *Id.*  He noted that cervical x-ray showed some "degenerative disease [at] 5, 6 and C6-7."  R. 403.  He also asserted that based on the medical record and findings of degeneration and post-surgical scarring, he could not say that those conditions cannot cause pain.  R. 404.  When directly asked if such conditions could cause pain, he replied, "[f]or the normal people (INAUDIBLE) I suppose for the possible complications, I would (INAUDIBLE) myself.  I don't know the answer."  *Id.*

The ME testified that the medical records did not include Claimant's myelogram scan

and the myelogram scan was a very significant test. R. 404-05. Therefore, the ALJ kept the record open, R. 405, and he requested that Claimant provide him with a copy of the myelogram test. R. 407. The ALJ received the myelogram test results and then sent them to the ME for his review and comment. R. 14. The ME then opined on the myelogram in a letter to the ALJ. R. 265.

The ME stated that the documentation of the myelogram confirmed the findings of the October 16, 2001 MRI of Claimant's cervical spine, which was available at the hearing. *Id.* He said the myelogram scan showed slight mass effect and indentation on the left side of the thecal sac within the left C5-C6 neural foramen. *Id.* He then concluded that the myelogram report "actually substantiates my opinion given at the time of hearing." *Id.*

The ME also stated that if there was documentation of clinical, EMG, or radiological findings more substantial than what was available at the time of hearing, his opinion was subject to change. *Id.* He noted that he was looking for clinical motor disorganization[1], electromyographic evidence of appropriate nerve root involvement, and/or radiographic evidence showing spinal canal stenosis or neural foramina[2] stenosis. *Id.* He noted that "[s]tenosis is more severe than thecal sac indentation." *Id.* Finally, he said that without any other evidence, such as something from an EMG, a neurosurgeon will not perform a laminectomy only because there is thecal sac indentation. *Id.*

---

[1]  Weakness in appropriate muscles innervated by involved nerve root. R. 265.

[2] More than one. R. 265.

5

### 3. Dr. Zaloudek - Medical Expert

Dr. Zaloudek, a psychiatrist, testified briefly at the hearing regarding Claimant's mental impairments. R. 413. Dr. Zaloudek believes the explanation of the depression is secondary to the medical causes from back pain. *Id.*

### 4. GleeAnn Kehr - Vocational Expert ("VE")

GleeAnn Kehr, a VE, testified at the hearing regarding existing jobs in the economy which might be suitable for Claimant. R. 414-16. Regarding Claimant's past relevant work, the VE stated that Claimant essentially had three different positions: (1) packager, which is sedentary and unskilled; (2) machine operator, which is heavy, at the very low end of semi-skilled, and would offer no benefit over an unskilled position with no residuals and no skills; and (3) quality assurance clerk, which is considered light and unskilled. R. 414. The ALJ asked the VE what positions exist that meet the demands of medium, light, and sedentary work for a hypothetical person who is 43 years old and has the same education and work history as Claimant. *Id.* The VE responded that there are no transferable skills or semi-skills. *Id.* Sedentary to medium work would allow Claimant's past positions as packager and quality assurance clerk, but would preclude machine operator. *Id.* Claimant's situation would allow tens of thousands of jobs at each of the three levels, including machine operator. The VE went on to say that those jobs are usually performed at light or medium physical demand and Claimant could perform it at a heavy duty. R. 414-15.

The ALJ then asked how a sit-stand limitation would impact the VE's analysis. The VE replied that sit-stand options are generally not allowed in manufacturing type settings.

*Id.* Lumping a variety of clerk positions together at the sedentary level, the VE said there were roughly 3,000 positions available with a sit/stand option. R. 415-16. At the light level and allowing a reduction for sitting and standing, the VE stated that there are approximately 8,000 positions available. R. 416.

Finally, Claimant's attorney asked the VE to consider a hypothetical person with the limitations contained in Dr. Wolf's questionnaire, R. 302-10, and with Claimant's same age, education, and past work experience who could work an eight-hour day sitting for a total of four and stand for a total of one, and is able to lift up to ten pounds occasionally and up to five pounds frequently. *Id.* The VE responded that such a person would be considered less than sedentary and it would preclude all substantial, gainful activity. *Id.*

## C.     MEDICAL EVIDENCE - PHYSICAL HEALTH

### 1.     Dr. Margo Wolf - Provena Saint Joseph Medical Center - March 2000 - February 2002

On March 29, 2000, Claimant presented to the emergency room at Provena Saint Joseph Medical Center with complaints of right arm tingling and weakness, right face weakness, and hot flashes. R. 124. Dr. Margo Wolf's impression at the time of admission included stroke, diabetes, and tobacco use. R. 125. She was admitted to the hospital to rule out the possibility of a progressive stroke. *Id.* On April 24, 2000, Dr. Wolf diagnosed

Claimant with a possible thalamic[3] stroke and hypercholesterolemia[4]. R. 123. Myocardial infarction was ruled out. *Id.* On April 24, 2004, Dr. Wolf also summarized Claimant's test results since her arrival on March 29, 2000. *Id.* Dr. Wolf reported that an MRI of the circle of Willis was negative, MRI of the brain was negative, CT scan of the cervical spine showed arthritis, CT scan of the brain was negative, chest x-rays were negative, EEG was normal, echocardiogram was normal, and an ultrasound of the carotids was normal. *Id.* Claimant also underwent a routine cervical spine exam on March 29, 2000 and Dr. Wolf noted degenerative changes about the lower cervical spine with no definite evidence of acute bony pathology identified. R. 148. Claimant was discharged on Plavix 75 a day and Niaspan 500 q.h.s. R. 123.

In June 2000, Dr. Wolf noted that Claimant was seeking disability for her back and she completed disability papers due to Claimant's depression. R. 259. "At this point, there is no hard evidence that she has complete disability other than her depression." *Id.* Claimant visited Dr. Wolf again on August 31, 2000 to have disability papers filled out and the papers were completed. R. 253. Claimant told Dr. Wolf she was unable to work and Dr. Wolf noted that it was most likely a depressive type of syndrome. Dr. Wolf had "no diagnosis" as to

---

[3] Relating to the thalamus, which is the large ovoid mass of gray matter that forms the larger dorsal subdivision of the diencephalon. *Stedman's Medical Dictionary* 1792 (27th ed. 2000).

[4] The presence of an abnormally large amount of cholesterol in the cells and plasma of the circulating blood. *Stedman's Medical Dictionary* 823 (27th ed. 2000).

why she had a weakness in her right leg. *Id.*

Claimant saw Dr. Wolf again in November 2000 to follow up. R. 250. Her disability papers were filled out and Dr. Wolf noted that Claimant had a failed back. *Id.* On January 22, 2001, Claimant presented to Dr. Wolf to have paperwork done and Claimant decided at that time that she could not go back to work. R. 249. Dr. Wolf noted that Claimant was having a lot of back pain. *Id.* Dr. Wolf provided Claimant with a note stating that she would not be able to return to work. *Id.*

On March 16, 2001, Dr. Wolf wrote a letter for Claimant outlining her impairments. R. 211-12. In the letter, Dr. Wolf noted that she has seen Claimant on a near monthly basis for approximately two years for various conditions, including "deconditioning, diabetes, followup on sequelae to her back problems, possible stroke, obesity, depression, smoking problems, [and] cardiac arrhythmia." R. 211. Dr. Wolf described Claimant as a patient that walks with a limp, walks very slowly, complains of weakness in her legs, has difficulty rising from a chair, and has difficulty concentrating. *Id.* She stated that Dr. Surendra Mohan Gulati diagnosed her with a thalamic stroke, but Claimant's MRIs of the brain and circle of Willis were negative. *Id.* The letter noted that while a coagulopathy study of Claimant was found to be benign, she was started on Plavix and aspirin to help prevent a further, more significant stroke. *Id.* Furthermore, Dr. Wolf reported that Claimant had a long history of anemia with iron deficiency and had a chronically elevated white blood cell count, "which might indicate that she has an undiagnosed chronic infection which has eluded all testing so far." *Id.* The letter stated that "[p]robably the most significant part of her laboratory findings is a very low

HDL. This would put her at extreme risk for cardiac disease, as well as a very high triglyceride. She is being treated with niacin for that problem." *Id.* Dr. Wolf summarized that:

> [Claimant] is a patient in early 40's who appears to be in her late 60's. She has a multiple chronic medical conditions[.] She is very deconditioned. The prognosis for her making a significant improvement is very poor. I would predict that this woman will have early heart disease, will be prone to blood clots, and the source of her elevated white blood cell count still remains a mystery.

R. 212.

On July 30, 2001, Claimant reported to Dr. Wolf that her back pain was an 8 out of 10 intensity all day long and she was unable to stand or sit. R. 248. Dr. Wolf noted that, "[u]nfortunately, none of this can be substantiated." *Id.* She stated that there were a few abnormalities on the MRI of her cervical spine and lumbar spine, "which may be consistent with her complaints." *Id.* Dr. Wolf filled out Claimant's disability papers that day. *Id.*

In a Multiple Impairments Questionnaire completed by Dr. Wolf on July 30, 2001, R. 203-210, she stated that plaintiff's condition included failed back surgery, a stroke, and a frozen shoulder. R. 203. Her prognosis was that she expected no further recovery by Claimant. *Id.* The clinical findings Dr. Wolf reported to support her diagnosis were an April 28, 2001 MRI showing a herniated disc below C6-C7 and post-surgical scarring of L4/L5. *Id.* The report noted that Claimant suffered from constant pain in the neck, low back, and shoulder with an intensity of 8 out of 10. R. 204.

In her residual functional capacity assessment of Claimant working in a normal, competitive five days per week work environment on a sustained basis, Dr. Wolf stated that

Claimant, in an eight-hour day, could sit on and off for 4 hours and stand or walk for one hour. R. 205. She said it would be necessary for Claimant not to sit continuously in a work setting, not to stand or walk continuously in a work setting, and Claimant would need to get up every 15 to 30 minutes to move around for 15 minutes before Claimant could sit back down. R. 206. Dr. Wolf said Claimant could only lift up to 5 pounds occasionally and could only carry up to 5 pounds occasionally. *Id.* However, Dr. Wolf noted that Claimant did not have significant limitations in doing repetitive reaching, handling, fingering, or lifting. *Id.* Moreover, she reported that Claimant would have no limitations grasping, turning, or twisting objects and no limitations using her fingers and hands for fine manipulations. R. 207. Claimant would, however, have minimal limitations using her arms for reaching, including reaching overhead. *Id.* Dr. Wolf listed the medications that Claimant had been prescribed and stated that physical therapy had made her worse. *Id.*

Dr. Wolf said that Claimant's symptoms would likely increase if she was placed in a competitive work environment, her condition interfered with her ability to keep her neck in a constant position, and Claimant could not do a full-time job that required her to keep her neck in a constant position for a sustained basis. R. 207-208. Dr. Wolf noted that Claimant's pain, fatigue, and other symptoms were severe enough to interfere with her attention and concentration constantly. R. 208. She reported that Claimant's impairments were ongoing and she expected them to last at least 12 months. *Id.* Dr. Wolf also stated that Claimant could tolerate low work stress, she was emotionally discouraged because of her pain when she moved, and she was not a malingerer. *Id.*

Dr. Wolf found that Claimant would probably need to take unscheduled breaks every 15 minutes during a work day, she would have "good days" and "bad days," and she would be absent more than 3 times each month due to her impairments and treatment. R. 208-209. Dr. Wolf reported that Claimant is not prone to infections, but she would need a job that provided ready access to a restroom. R. 209. Finally, Dr. Wolf noted several limitations[5] that would affect Claimant's ability to work at a regular job on a sustained basis and she stated that the symptoms and limitations she had described had applied since Claimant's original exam. *Id.*

On February 25, 2002, Dr. Wolf prepared a stroke impairment questionnaire for Claimant. R. 214-19. She reported that Claimant had a possible cerebrovascular[6] accident in March of 2000. R. 214. Dr. Wolf identified Claimant's symptoms as the following: balance problems, weakness, numbness and tingling, fatigue, low back pain, difficulty concentrating, headaches, emotional lability demonstrated by her sensitivity and crying for no reason, difficulty solving problems, and she wears glasses due to vision problems. R. 215-216.

She noted that Claimant's symptoms and limitations were reasonably consistent with her impairments described in the evaluation. R. 216. If Claimant was placed in a normal competitive 5 day a week work environment on a sustained basis, Dr. Wolf stated that her

---

[5] These included: psychological limitations; no pushing, pulling, kneeling, bending, or stooping; and a need to avoid wetness, noise, fumes, gases, temperature extremes, humidity, dust, and heights. R. 209.

[6] Relating to the blood supply to the brain. *Stedman's Medical Dictionary* 313 (27th ed. 2000).

residual functional capacity for an 8-hour day would be sitting for 1 hour and standing or walking for 0-1 hour. R. 217. Dr. Wolf reported that Claimant could only occasionally lift up to 10 pounds and occasionally carry up to 5 pounds. *Id.* She noted that Claimant's impairments had lasted or she expected them to last 12 months, Claimant was not a malingerer, and emotional factors contributed to the severity of Claimant's symptom's and limitations. *Id.* Dr. Wolf wrote that Claimant's symptoms were constantly severe enough to interfere with her attention and concentration, and she was incapable of tolerating even low work stress. *Id.* Dr. Wolf also noted that Claimant's impairments were likely to produce all "bad days" and no "good days." *Id.* Finally, Dr. Wolf listed Claimant's other limitations[7] that would affect her ability to work at a regular job and stated that these symptoms and limitations have affected Claimant since March 2000. R. 219.

## 2. Dr. Surendra Mohan Gulati - Provena Saint Joseph Medical Center - May 2000

In May 2000, Dr. Surendra Mohan Gulati completed an electromyography report, which was normal. R. 116.

---

[7] These included: no pushing, pulling, kneeling, bending, or stooping, and a need to avoid fumes, gases, temperature extremes, dust, and heights. R. 219.

### 3. Dr. Sasan Payvar - Provena Saint Joseph Medical Center - October 2000

On October 14, 2000, she underwent an MRI on her combined lumbar spine. R. 131-32. Dr. Sasan Payvar noted that Claimant had a prior laminectomy change. R. 132. Dr. Payvar also reported that "[m]inimal enhancing soft tissue in the posterior aspect of the L-4/L-5 disc space and in the ventral epidural space at this level represents minimal post-surgical scarring." *Id.* Dr. Payvar noted that no definite recurrent disc herniation was seen. *Id.*

### 4. Dr. Yatin Shah - March 2001

On March 6, 2001, Dr. Yatin Shah evaluated Claimant. R. 167-170. Dr. Shah reported normal alignment and mobility of Claimant's head and neck. R. 168. Claimant's back range of motion was limited. Dr. Shah noted that Claimant's gait/station was normal and Claimant could undergo exercise testing and/or participate in an exercise program. Claimant was found to have a normal range of motion and strength in her right and left upper extremities, as well as her right and left lower extremities, and she had no joint enlargement or tenderness at any extremity. Claimant's reflexes were both normal and symmetric, and her sensation was intact. *Id.*

In the report, Dr. Shah stated that Claimant had a history of low back pain for five years and she was status plaminectomy for a herniated disc of the lumbosacral spine. *Id.* Dr. Shah found that straight leg raising on both sides was normal, but range of motion was decreased. Dr. Shah also noted that Claimant was able to do her daily activities and was able to ambulate without any assisting devices. *Id.*

### 5. Dr. K. S. Parameswar - March 2001

One week later, on March 12, 2001, Dr. K. S. Parameswar reported that "AP and lateral views of the lumbar spine reveal osteoporosis of the bony structures, but no evidence of a fracture or dislocation. The intervertebral disc spaces are well preserved. Changes secondary to a cholecystectomy are seen." R. 170.

### 6. Dr. Francis Vincent - Physical Residual Functional Capacity Assessment - April 2001

In April 2001, Dr. Francis Vincent, a state agency physician, reviewed Claimant's record evidence and concluded that Claimant had the following exertional limitations: she could occasionally lift and/or carry up to 50 pounds, frequently lift and/or carry up to 25 pounds, stand and/or walk with normal breaks for about 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour workday, and she was otherwise unlimited in her ability to push and and/or pull. R. 175. Dr. Vincent reported that Claimant had no manipulative limitations, no visual limitations, no communicative limitations, no environmental limitations, and no postural limitations, except that she could not climb ladders, ramps, or scaffolds if she was in pain. R. 176-178.

### 7. Dr. Barry Free - Physical Residual Functional Capacity Assessment - April 2001

Dr. Barry Free, another state agency physician, reviewed the record evidence and affirmed Dr. Vincent's assessment on July 26, 2001. R. 181.

### 8. Dr. George E. DePhillips - November 2001

Dr. George E. DePhillips saw Claimant on November 12, 2001 for a neurosurgical consultation. R. 225. Claimant presented to Dr. DePhillips with a 4 to 6 week history of neck discomfort and numbness and tingling her left arm and hand. *Id.* Dr. DePhillips ordered a cervical myelogram and an EMG of her left upper extremity. *Id.* He noted that Claimant's neurologic examination did not reveal any motor weakness or sensory loss and her reflexes were symmetrical. *Id.*

The cervical myelogram was performed on November 27, 2001, and it demonstrated slight mass effect and indentation on the left side of the thecal sac within the left C-5/C-6 neural foramen. R. 262. No other definite mass effect or abnormality was seen on the thecal sac, and the cervical spinal cord appeared to have a normal caliber. *Id.*

A CT of the cervical spine was also performed on November 27, 2001, and it found that there were no disc herniations or evidence of significant spinal stenosis at C3/C4, C4/C5, C6/C7, or C7/T1. R. 264. At C5/C6, however, the impression was that there was left foraminal stenosis due to a small broad-based left foraminal disc protrusion, which caused compression of the exiting left C6 nerve root sleeve. *Id.* Finally, there was no central stenosis and the myelogram was otherwise unremarkable. *Id.*

### D. MEDICAL EVIDENCE - MENTAL HEALTH

### 1. Dr. Cosme Lozano - Consultative Psychiatric Evaluation - March 2001

On March 6, 2001, Dr. Cosme Lozano performed a consultative psychiatric evaluation of Claimant for purposes of her disability claim. R. 171-173. Claimant reported that depression had been affecting her ever since her back was injured in a car accident. R. 171.

Claimant had been on Zoloft 50 mg daily for the past six months and her depression had gotten slightly better since going on the medicine. *Id.* Dr. Lozano found that Claimant was a middle-aged woman who appeared older than her stated age. R. 172. She also reported that Claimant's concentration was good and she was alert and oriented x3. *Id.* Dr. Lozano wrote that Claimant could spell "world" forwards and backwards, recall 3 out of 3 words immediately and within 5 minutes, and she could recall the last two presidents, but not the last three. *Id.* She also noted that Claimant's remote memory was intact but her affect was constricted and dysphoric. *Id.*

Dr. Lozano reported that Claimant's insight and judgment were good and her thought process was coherent and sequential. *Id.* Dr. Lozano's diagnosed Claimant with major depression - single with her depressive order secondary to medical etiology from back pain. *Id.* Dr. Lozano noted that she instructed Claimant to get a referral to follow up with a psychiatrist for a reevaluation of her mood and to further adjust the medications that treat her depression. R. 173. Finally, Dr. Lozano stated that Claimant was not actively suicidal at the time of her evaluation and her overall functioning had been decreased due to depression in addition to multiple medical issues. *Id.*

## 2. DDS Physician - Psychiatric Review - May 2001

A psychiatric review technique form completed by a DDS physician, dated May 10, 2001, and affirmed July 26, 2001, stated that Claimant had an affective disorder. R. 189. Claimant's affective disorder, a disturbance of mood accompanied by a full or partial manic or depressive syndrome, was evidenced by a pervasive loss of interest in almost all activities,

sleep disturbance, decreased energy, and feelings of guilt or worthlessness. *Id.* The

functional limitations resulting from Claimant's affective disorder were listed as: moderate

restriction of daily living activities; no difficulties in maintaining social functioning; mild

difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of

decompensation. R. 196.

### 3. DDS Physician - Mental Residual Functional Capacity Assessment - May 2001

A mental residual functional capacity assessment completed by a DDS physician,

dated May 10, 2001, and affirmed July 26, 2001, reported that Claimant had the following

limitations: moderately limited in her ability to both carry out detailed instructions and

maintain attention and concentration for extended periods; moderately limited in her ability

to complete a normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods; and moderately limited in her ability to respond appropriately to

changes in the work setting. R. 182-83. The DDS physician also stated,

> Claimant experiences an affective disorder that has occurred secondary to a
> back injury ... There is no indication of serious memory or understanding
> impairment, as confirmed by exam. Sustained concentration is impaired, but
> allows the performance of simple tasks. This is confirmed by the ability to
> respond well to examination questions, cook and do simple chores. There are
> no indications of serious problems with social skills. Claimant retains
> friendships and relates well. Adaptation abilities are impaired. However,
> [C]laimant can perform routine, repetitive tasks, as indicated by the ability to
> follow instructions. The ability to travel is reduced, but not due to mental
> illness.

R. 184.

## E. THE ALJ'S DECISION - JANUARY 9, 2003

After conducting the hearing and reviewing the evidence, the ALJ found that Claimant was not disabled within the meaning of the Social Security Act. R. 11-19. Although he determined that Claimant had impairments, a back disorder, and an affective disorder that were "severe," and that she could not perform any past relevant work, the ALJ found that Claimant had the residual functional capacity to perform unskilled sedentary work with a sit/stand option. R. 18.

The ALJ assessed Claimant's application for DIB under the five-step sequential analysis. *See infra*, Part II B (describing the disability standard of review). Under step one of the disability analysis, the ALJ found that Claimant did not engage in any substantial gainful activity since her alleged onset date. R. 15, 18.

Under the second step, the ALJ found that Claimant had impairments, a back disorder, and an affective disorder that were severe impairments. *Id.* At step three, however, the ALJ determined that Claimant's severe impairments did not "meet[] or equal[]" a listed impairment under the Social Security regulations. *Id.*

At step four, the ALJ determined Claimant's residual functional capacity. The ALJ first noted that the medical record is devoid of evidence of any condition that would prevent Claimant from performing a full range of light work. R. 17. The Claimant alleged at the hearing that her back pain was her major problem, but the ALJ found a lack of objective medical evidence to support such allegations. *Id.* The ALJ mentioned that it appears Claimant credits her disability to her back problem at C5/C5, yet she earlier alleged her

disability was due to a stroke. *Id.* The ALJ also found no convincing evidence that her depression would interfere with her ability to concentrate on simple, work-related tasks. *Id.* The ALJ found that she has the ability to perform sedentary work with a sit/stand option. *Id.* Finally, the ALJ concluded that "the claimant's testimony, including that of pain and functional limitations, when compared against the objective evidence and evaluated using factors in [SSR] 96-7p, was not entirely credible." *Id.*

Under step five, the ALJ determined that based upon her residual functional capacity, Claimant could not perform any past relevant work. R. 17-18. However, in light of the VE's testimony, the ALJ concluded that there were at least 3,000 simple, repetitive clerk positions of a sedentary nature that Claimant could perform with a sit/stand option. *Id.* Therefore, the ALJ concluded that Claimant is not disabled. R.18.

## II. LEGAL STANDARDS

### A. STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an administrative law judge, ("ALJ"), becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir. 1993)**.** Under such circumstances, the decision reviewed by the district court is the decision of the ALJ. *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993). Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to

support the findings.  *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  A mere scintilla of evidence is not enough.  *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996).  If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand.  *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration.  *Diaz,* 55 F.3d at 305-06.  Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings.  *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1991)**.**  The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## B.   DISABILITY STANDARD

Disability insurance benefits, ("DIB"), are available to claimants who can establish "disability" under the terms of Title II of the Social Security Act, ("Title II"). *Brewer v. Charter*, 103 F.3d 1384, 1390 (7th Cir. 1997). An individual is "disabled" if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, a disabled individual is eligible for DIB only if that individual is under a disability. 42 U.S.C. §§ 423(a); 1382c(a). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). If the ALJ finds at any step of this process that a claimant is not disabled, the inquiry ends. *Ismahel v. Barnhart,* 212 F. Supp. 2d 865, 872 (N.D. Ill. 2002). The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work

in the national economy.  *Id.*

## III.  DISCUSSION

Claimant raises three issues for review: (1) whether the ALJ erred by failing to properly explain the reduced weight he gave to Claimant's treating physician, Dr. Wolf; (2) whether the ALJ properly found that the Claimant was not credible; and (3) whether the ALJ erroneously posed an incomplete question to the VE.  The Court will discuss each issue in turn.

## A.   THE ALJ DID NOT ERR IN HIS EXPLANATION OF THE REDUCED WEIGHT HE GAVE TO THE OPINION OF CLAIMANT'S TREATING PHYSICIAN

Claimant first argues that the ALJ erred by not properly explaining why he relied on the testimony of the ME and gave reduced weight to the opinion of Dr. Wolf, Claimant's treating physician.  While Claimant concedes that the determination of residual functional capacity is reserved for the ALJ, Claimant asserts that the ALJ may not merely disregard the opinions of treating physicians.  Claimant argues that the ALJ must, at a minimum, explain why he adopts the opinion of a medical expert who never treated Claimant and discards the opinion of a treating physician who saw Claimant for a period of more than two years.  Moreover, Claimant argues that the ALJ should have discussed his evaluation of the factors set forth in 20 C.F.R. § 404.1527.

A treating physician's opinion is given controlling weight by the ALJ if he finds it "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2).

When the treating physician's opinion is not given controlling weight, the ALJ applies the following factors in determining the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) the amount of relevant evidence that supports the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician; and (6) any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6). Finally, the ALJ "will always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [the] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).

The ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence exists to support the ALJ's decision so long as a "reasonable mind might consider the supporting evidence contained in the record to be adequate." *Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1201 (N.D. Ill. 2005) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). A contrary opinion by a non-treating physician does not constitute substantial evidence. *Gudgel*, 345 F.3d at 470. However, "it is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2003) (citing 20 C.F.R. § 416.927(f)(2)(1)).

In the instant case, the ALJ provided an adequate explanation for his decision to give reduced weight to the opinion of Dr. Wolf. In his decision, the ALJ provided a lengthy review of Claimant's medical history. R. 15-17. He set forth Claimant's objective medical

evidence beginning with her initial emergency room visit on March 29, 2000. R. 15. The

ALJ's discussion of this evidence serves as the foundation for the ME's testimony. The ALJ

shaped his presentation of Claimant's medical history to show that concrete, objective data

that would account for Claimant's back pain was absent from her medical record.[8]  After

discussing the relevant, objective medical evidence, the ALJ stated that the ME "testified that

the record lacked objective medical evidence to support the treating physician's residual

functional capacity findings." R. 17.

Following his analysis of Claimant's medical history provided at the hearing, the ALJ

discussed the results of the November 27, 2001 cervical myelogram that Claimant submitted

after the hearing. He noted that Claimant "argued that this myelogram along with the

October 24, 2000 MRI of the lumbar spine which showed degenerative scarring, provided

---

[8] The ALJ's analysis of Claimant's medical history states, "[Claimant's March 29, 2000] [e]xamination revealed subtle findings of mild weakness of the right hand. The possibility of a thalamic stroke was raised based on the [C]laimant's complaints although there was no papillary asymmetry or reflex abnormalities. Cortical sensory modalities were normal. A CT scan of the brain was negative. An MRI of the brain was normal. EEG was normal. Myocardial infraction was ruled out ... [Claimant's March 6, 2001 consultative] [e]xamination was unremarkable except for decreased range of motion in her back. There was no evidence of any end organ damage. An X-ray of the lumbar spine revealed osteoporosis of the bony structures, but no evidence of fracture or dislocation. The intervertebral disc spaces were well preserved ... [Claimant's March 6, 2001] [m]ental status examination revealed good concentration ... She was diagnosed with major depression - single; depressive order secondary to medical etiology from back pain ... [Dr. Wolf's June 2000 through February 2002] documentation shows that her stroke could never be proven ... [November 12, 2001] [n]eurological examination did not reveal any motor weakness or sensory loss and reflexes were symmetrical. An MRI in October 2001 showed diffuse, circumferential bulging discs at C5-6 and C6-7. An X-ray of the right hip and pelvis was unremarkable. An x-Ray of the left arm and shoulder was unremarkable. An MRI of the brain in September 2000 was normal." R. 15-17.

ample objective medical evidence to support a disability impairment as reported by Dr. Wolf on July 30, 2001 ... such that [C]laimant was unable to perform even sedentary work." *Id.* The ALJ then stated that the ME reviewed the myelogram results and reported that they "confirmed findings of MRI scan of Cervical Spine done on October 16, 2001 ... [the ME] said that there were no objective findings to support Dr. Wolf's residual functional capacity assessments and insufficient supporting documentation ...." *Id.*

While Claimant argues that "[t]he ALJ refers to [the ME's] comment that 'there were no objective findings to support Dr. Wolf's residual functional capacity assessments and insufficient supporting documentation,' but states nothing further in support of his rejection of Dr. Wolf's opinions," Pl. Rep. 2, Claimant neglects to recognize the ALJ's extended discussion of Claimant's medical record that immediately precedes the ME's assertion. The ALJ presented at length Claimant's medical history to underscore the dearth of objective evidence in the record. Moreover, the ALJ laid a foundation for his adoption of the ME's opinion and his rejection of Dr. Wolf's opinion. Put simply, the ME testified that there were no objective findings to substantiate Dr.Wolf's opinion, and the ALJ used the previous two pages of his decision to demonstrate that there were indeed no objective findings. R. 15-17. The ALJ clearly presented his reasons for rejecting Dr. Wolf's opinion and accepting the ME's opinions in his decision.

The ALJ's findings will not be upheld if the reasons given by the ALJ "do not build an accurate and logical bridge between the evidence and the result." *Sarchet,* 78 F.3d at 307. In this case, the ALJ assembled a logical bridge between the lack of objective medical

evidence in Claimant's record and his rejection of Dr. Wolf's opinion. The ALJ adequately discussed Claimant's medical record and established a foundation to accept the ME's opinion and discard the treating physician's opinion. Moreover, "[i]t is almost always possible to provide a more detailed, more thorough explanation, but the ALJ is not required to explain the role that each piece of evidence had in making these difficult decisions." *Ellis*, 384 F. Supp. 2d at 1203 (citing *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999)). The ALJ's duty when he rejects or credits medical evidence is to minimally articulate his reasons for his analysis. *See Clifford*, 227 F.3d at 870. In this case, the ALJ adequately articulated his reasons for crediting the ME's opinion and rejecting Dr. Wolf's opinion and thus committed no error.

## B. THE ALJ DID NOT ERR IN EXPLAINING HIS DETERMINATION THAT CLAIMANT WAS NOT CREDIBLE

Claimant argues that the ALJ failed to meet the legal requirements in his discussion of Claimant's credibility. Specifically, Claimant asserts that the ALJ merely summarized Claimant's medical evidence and did not discuss the evidence as it relates to Claimant's impairments and symptoms. Therefore, Claimant argues, the ALJ failed to follow the two-step inquiry set forth in Social Security Ruling 96-7p and thus committed legal error in reaching his conclusion that Claimant was not credible.

The ALJ is afforded special deference in his credibility determinations because he is in the best position to see and hear the claimant and assess her forthrightness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Therefore, an ALJ's credibility determination will only be reversed if the claimant can show it was "patently wrong." *Id.* The ALJ must follow

the two-step process outlined in SSR 96-7p when evaluating a Claimant's symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

Under the first step, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. SSR 96-7p. This first step does not involve a determination regarding the intensity, persistence, or functionally limiting effects of the claimant's symptoms. *Id.* If the ALJ finds an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms, he goes on to the second step. *See id.*

Step two requires the ALJ to "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* Under this second step, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

In this case, while the ALJ did not expressly label each step, he did adhere to the two-step process set forth in SSR 96-7p. First, the ALJ found that Claimant has impairments, a back disorder, and an affective disorder that are "severe." R. 18. Thus, notwithstanding the fact that the ALJ did not clearly identify that he was applying step one of the SSR 96-7p two-step process, the ALJ followed step one when he found that Claimant has severe impairments.

The ALJ's credibility determination takes place under step two, *see id*, and the ALJ's determination will be affirmed "as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). SSR 96-7p states that it "is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" On the contrary, the ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the

individual's statements and the reasons for that weight." *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

In *Skarbek*, the ALJ determined that the claimant was not credible regarding his limitations. 390 F.3d at 505. The ALJ gave only two reasons for his findings.[9] *Id.* The Seventh Circuit, however, found that the ALJ complied with 96-7p's requirement that he give specific reasons for his findings even he though he only provided two reasons. *Id.*

In this case, the ALJ gave several reasons and provided sufficient support for his credibility finding. As noted above, the ALJ provided a lengthy discussion of Claimant's medical history and demonstrated that concrete, objective data that would account for Claimant's back pain was absent from her medical record. R. 15-17. The ALJ then noted in his credibility discussion that Claimant alleged at the hearing that her major problem was her back pain. R.17. Therefore, the ALJ wrote, "[t]here is a lack of objective medical evidence to support her allegations." *Id.* Next, the ALJ found that nothing in the medical record showed any condition that would prevent Claimant from performing a full range of light work. *Id.* Moreover, the ALJ directly expressed his doubt about Claimant's credibility when he stated that it "appears she switched from alleging disability due to a disabling stroke

---

[9] "First, the ALJ stated that Skarbek's testimony of constant throbbing pain was not consistent with the findings of the specialists or with Skarbek's medical records. Second, the ALJ stated that Skarbek's testimony regarding his daily activities--that, among other things, he drove, did laundry and household chores, and was able to cut grass on occasion--did not support a finding that he was totally disabled. The ALJ found that Skarbek's abilities and activities were more consistent with the opinions of Dr. Yergler and Dr. Graham than with his own testimony." *Skarbek*, 390 F.3d at 505.

to a back problem at C5/C5." *Id.* Notwithstanding this dubious switch in impairment allegations, the ALJ noted that he was "giving the [C]laimant the benefit of the doubt, [and he found] that she has the ability to perform sedentary work with a sit/stand option." *Id.* Therefore, based on the foregoing reasons, the ALJ "conclude[d] that the [C]laimant's testimony, including that of pain and functional limitations, when compared against the objective evidence and evaluated using factors in [SSR] 96-7p, was not entirely credible." *Id.* In light of *Skarbek* and the ample support the ALJ provided, this Court finds that the ALJ observed the SSR-96-7p requirements and did not err in his explanation of his credibility determination.

## C. THE ALJ DID NOT COMMIT ERROR IN THE HYPOTHETICAL QUESTION HE POSED TO THE VOCATIONAL EXPERT

At the hearing, the ALJ asked the VE:

Given the hypothetical person the claimant's age, education and work history, if I were to find a position that meets the demands of medium, light, and sedentary work, what is your opinion of that person's ability to engage in substantial gainful activities, and please address past relevant work and transferable skills, if any, and at each level?

R. 414. Following the VE's answer that it would allow for tens of thousands of jobs at each of those three levels, the ALJ then narrowed his hypothetical by asking what impact would result if Claimant was limited to only performing "routine repetitive tasks." R. 415. The VE informed the ALJ that packaging and machine operator positions "are generally just that." *Id.* Next, the ALJ further narrowed his hypothetical by querying how the VE's answer would change if she "had a sit-stand option." *Id.* The VE stated that clerk-type positions would be

available, with roughly 3,000 available at the sedentary level, and approximately 8,000 at the light level.  R. 415-416.

Based on Dr. Wolf's July 30, 2001 Multiple Impairment Questionnaire, Claimant's attorney further restricted the hypothetical by asking the VE to "assume someone with the [C]laimant's same age, education and past work that they were able to work a total eight hour day, sit for a total of four and stand for a total of one, lift up to ten pounds occasionally, but five pounds frequently, is that person (INAUDIBLE) for the national counsel?"  R. 416.  The VE answered, "[t]hat would be considered less than sedentary, (INAUDIBLE) would preclude all substantial gainful activity."  *Id.*  Because the ALJ determined in his decision that Claimant had the residual functional capacity to perform unskilled sedentary work with a sit/stand option, R. 18, and neglected to ask or account for Claimant's attorney's follow-up hypothetical question that included all of Claimant's alleged impairments, Claimant argues that the ALJ committed legal error by asking an incomplete hypothetical question to the VE at the hearing.  Pl. Mot. 16-18.

When posing a hypothetical question to the VE, the ALJ "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record."  *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994).  Therefore, in this case, since the ALJ relied upon the ME and not Dr. Wolf's opinion, and found Claimant not credible, as explained above, the ALJ was not required to include Claimant's other alleged impairments in the hypothetical.  The ALJ was only required to ask the VE about Claimant's impairments that were supported by the medical evidence in the record.  That is exactly what

the ALJ did in this case, and thus the ALJ committed no error in the hypothetical question he posed to the VE.

## IV. CONCLUSION

An ALJ could always write a fuller and lengthier decision. However, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). In this case, the ALJ considered all of the evidence, gave Claimant every opportunity to prove her case, and wrote an adequate decision that built a logical bridge between the evidence and the result. In the end, the record was simply devoid of objective medical evidence supporting her alleged impairments. **Therefore, for the reasons set forth in this opinion, Plaintiff's Motion for Summary Judgment is DENIED and the Commissioner's Motion for Summary Judgment is GRANTED.**

**SO ORDERED THIS 21ST DAY OF NOVEMBER, 2005.**


**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Christopher S. Montgomery
HANSON & HANSON ATTORNEYS
AT LAW, P.C.
1802 North Division Street, Suite 304
Morris, IL 60450

Counsel for Plaintiff
Cynthia A. Brandel
SPECIAL ASSISTANT UNITED
STATES ATTORNEY
200 West Adams Street, 30th Floor
Chicago, IL 60606

Counsel for Defendant